## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

KATHY H.,

                                        Plaintiff,

          v.                                              5:19-CV-684
                                                          (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

STEVEN R. DOLSON, ESQ., for Plaintiff
TIMOTHY A. RAZEL, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER
United States Magistrate Judge

### MEMORANDUM-DECISION AND ORDER

        This matter was referred to me, for all proceedings and entry of a final judgment,

pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in

accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y.

Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 6).

## I.      PROCEDURAL HISTORY

        Plaintiff filed her application for Disability Insurance Benefits ("DIB") on July

19, 2011, alleging disability beginning December 6, 2010. (Administrative Transcript

("T.") at 113, 278, 808).  Plaintiff's claim was denied initially on November 17, 2011.

(T. 113).  Plaintiff made a timely request for a hearing, which was held before

Administrative Law Judge ("ALJ") Marie Greener on December 4, 2012. (T. 77-111,

duplicate at 944-76).  ALJ Greener issued an unfavorable decision on February 5, 2013.

(T. 118-25).  On May 13, 2014, the Appeals Council remanded the case to ALJ Greener

for further hearing and consideration of specific issues. (T. 131-34).

ALJ Greener held a new hearing on September 4, 2014, at which the ALJ heard testimony from plaintiff and Vocational Expert ("VE") Linda Voss. (T. 29-71). On November 5, 2014, ALJ Greener issued another unfavorable decision. (T. 13-21). The Appeals Council denied plaintiff's request for review of the November 5, 2014 decision on May 23, 2016, and plaintiff timely filed a federal court action, consenting to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c). (T. 1-3); *Kathy H. v. Comm'r of Soc. Sec.*, No. 5:16-CV-677 (DEP). On March 31, 2017, in a decision from the bench, Magistrate Judge David E. Peebles granted plaintiff's request for judgment on the pleadings, remanding plaintiff's case to the Commissioner for further evaluation of the treating physicians' opinions. (T. 924-36).

Plaintiff filed a subsequent application for DIB dated July 19, 2016.[1] (T. 912). On November 15, 2017, the Appeals Council consolidated the federal court's remand action with plaintiff's new application and sent the consolidated case to a different ALJ for further proceedings and the issuance of a new decision on the consolidated claims. (T. 939). On July 26, 2018, a hearing was held before ALJ Gretchen M. Greisler,[2] at which plaintiff and VE Kentrell Pittman testified. (T. 836-88).

---

[1] Plaintiff's date last insured is December 31, 2016. (T. 808).

[2] There is an odd discrepancy in the date of the hearing. In her opinion, ALJ Greisler states that the hearing was held on July 26, 2018. (T. 808). The transcript of ALJ Greisler's hearing is dated July 26, 2016. (T. 836-88). There is no transcript in the record dated July 26, 2018. However, the 2016 must be an error because some of the evidence admitted at the hearing is dated in 2018. (*See* T. 840 - hearing transcript dated July 26, 2016, but citing inter alia Ex. 47F, which is dated July 26, 2018). In addition, ALJ Greisler's March 21, 2019 decision stated that "At the hearing on July 26, 2018, Exhibits 1A-11A, 1B-34B, 1D-15D, and 1F-47F were entered into the record without objection." (T. 808-809). The transcript which is dated July 26, 2016 contains the above citation to the exhibits, with what appears to be one typographical error (the hearing transcript refers to Exhibits 1B-33B). (T. 840). Thus, the only logical conclusion is that the date on the transcript is incorrect. This discrepancy does not affect the court's decision.

After the hearing, ALJ Greisler asked for additional vocational evidence by way of interrogatory to VE David Festa as well as an additional medical opinion from Dr. Sreedevi Chandrasekhar, M.D. (T. 1208, 1224-37 - Festa; T. 1553, 1565-73 - Chandrasekhar).  ALJ Greisler also requested an additional medical opinion regarding plaintiff's psychological impairments from Mary E. Buban, Psy.D., which was also obtained through an interrogatory to the provider. (T. 1581, 1592, 1593-1604).  After affording the plaintiff the opportunity to comment on the additional evidence, on March 21, 2019, ALJ Greisler issued an unfavorable decision. (T. 808-825).  Plaintiff appealed directly to this court by filing this action on June 7, 2019. (Dkt. No. 1).

## II.    GENERALLY APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such  severity that he is not only unable to do his previous work but  cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hire if he applied for work

42 U.S.C. § 1382(a)(3)(B).  The Commissioner uses a five-step process, set forth in 20

C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI

disability claims.

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity. If he is not, the [Commissioner]
> next considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to do basic work
> activities. If the claimant suffers such an impairment, the third inquiry is
> whether, based solely on medical evidence, the claimant has an impairment
> which meets or equals the criteria of an impairment listed in Appendix 1 of
> the regulations. If the claimant has such an impairment, the
> [Commissioner] will consider him disabled with-out considering vocational
> factors such as age, education, and work experience… Assuming the
> claimant does not have a listed impairment, the fourth inquiry is whether,
> despite the claimant's severe impairment, he has the residual functional
> capacity to perform his past work. Finally, if the claimant is unable to
> perform his past work, the [Commissioner] then determines whether there
> is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,

416.920. The plaintiff has the burden of establishing disability at the first four steps.

However, if the plaintiff establishes that his impairment prevents him from performing

his past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine

whether the correct legal standards were applied and whether substantial evidence

supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v.

Soc. Sec. Admin. Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).

It must be "more than a scintilla" of evidence scattered throughout the administrative

4

record. *Id.* However, this standard is a very deferential standard of review, "even more so than the 'clearly erroneous standard.'" *Brault,* 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (Finding we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "pick and choose evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112 (W.D.N.Y. Dec. 6, 2010).

## III.   FACTS

Plaintiff was born on July 14, 1962, making her 48 years old on the date of onset and 54 years old on her date last insured. (T. 113).   Plaintiff completed one year of college,[3] and has past relevant work experience as a "Stores Laborer." (T. 282, 824).  In

---

[3] In one of her Disability Reports, plaintiff alleges that she only completed the 12th grade. (T. 1130).  This slight discrepancy does not affect any of the ALJ's findings.

a more recent[4] "Disability Report," plaintiff alleges disability due to lumber spine impairment, cervical spine impairment, carpal tunnel syndrome, right hip labral tear, depression, anxiety, and hypothyroidism. (T. 282, 1128).

The Commissioner has incorporated the summary of the medical facts as stated by ALJ Greisler,[5] and "generally adopts" the plaintiff's recitation of the procedural and factual background of this case. (Def.'s Br. at 3) (Dkt. No. 14).  Plaintiff has had three administrative hearings.  Rather than summarizing the evidence from each hearing and the medical records at the outset, I will refer to the pertinent records and proceedings during my discussion of the plaintiff's arguments.

## IV.    THE ALJ'S DECISION

After reviewing the procedural background of the plaintiff's case (T. 808-809), and finding that plaintiff had not engaged in substantial gainful activity since her alleged onset date (T. 811), the ALJ found the following severe impairments at step two of the sequential analysis: "spinal disorder, vertigo, hip impairment with a right hip labral tear, headaches and migraines, right knee impairment with patellofemoral chondromalacia, lateral epicondylitis of bilateral elbows, extensor digitorum longus tendinitis, asthma, anxiety, depression, and adjustment disorder." (T. 812).  Although plaintiff had additional "conditions," the ALJ found that these caused only "slight" abnormalities which would have no more than a minimal effect on plaintiff's ability to perform work

---

[4] Although the report itself is undated, it contains dates of medical examinations which occurred in 2016. (*See* T. 1133) (alleging that plaintiff began attending appointments at "Psychological Health Care" in May of 2016 "to present").

[5] The ALJ conducted an extensive review of the facts and the medical evidence in her severity section as well as in the RFC section of her decision. (T. 812-23).

during the relevant period, prior to her date last insured. (*Id.*)

At step three of the sequential evaluation, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (T. 812-15).  In making this determination, the ALJ considered Listing 1.02 (Major Dysfunction of a Joint); and "near" Listing 1.00 for musculoskeletal impairments, 11.00 for neurological disorders, and 14.00 for impairments of the immune system. (T. 812).  The ALJ also considered Listing 1.04 (Disorders of the Spine); and Listing 12.04 (Depressive, Bipolar, and Related Disorders).

At step four of the analysis, the ALJ found that plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) with the following exceptions: she must be able to change positions for five minutes after sitting, standing, or walking for one hour, but retains the ability to be on task during that time; she can occasionally stoop, balance, crouch, crawl, kneel and climb stairs and ramps, but cannot drive, climb ladders, ropes or scaffolds, work at unprotected heights, or in close proximity to dangerous machinery. (T. 815-23).  In addition, plaintiff can occasionally reach overhead and can frequently reach in all other directions and handle, finger, and feel. She cannot tolerate concentrated exposure to respiratory irritants.  Mentally, the plaintiff can perform simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements, involving only simple, work-related decisions and few, if any, workplace changes. (*Id.*)

Based on the above RFC, the ALJ found that plaintiff could not perform her past relevant work. (T. 824).  The ALJ then discussed plaintiff's age, finding that on the date

last insured, plaintiff was 54, which is defined as a "younger individual."[6] (T. 824).

However, plaintiff "subsequently changed age category to closely approaching

advanced age." (*Id.*)  Based on this finding, and considering plaintiff's education and

transferability of skills, the ALJ found that there were jobs existing in significant

numbers in the national economy that plaintiff could still perform. (*Id.*)

In making the step five determination that there were jobs existing in significant

numbers, the ALJ first considered the Medical Vocational Guidelines ("the Grids").

The ALJ stated that, if plaintiff had the RFC to perform a "full" range of light work, the

Grids would dictate a finding of "not disabled," whether plaintiff was in the younger

category or the approaching advanced age category. (*Id.*)  However, because the

plaintiff had additional limitations, impeding her ability to perform the full range of

light work, the ALJ relied on the interrogatory responses by VE Festa, solicited by the

ALJ after the hearing. (T. 824-25).  The ALJ found that plaintiff could perform three

"representative occupations": Shipping and Receiving Weigher (1,810 jobs available

nationally); Usher (5,133 jobs available nationally); and Counter Clerk (1,612 jobs

available nationally). (T. 825).  The ALJ thus found that plaintiff was not disabled

within the meaning of the Act. (*Id.*)

## V.    **ISSUES IN CONTENTION**

Plaintiff raises the following arguments in support of her position that the ALJ's

decision is not supported by substantial evidence:

1.    The ALJ erred in concluding that there were sufficient jobs in the national
       economy that plaintiff could perform. (Pl.'s Br. at 6-8) (Dkt. No. 9).

---

[6] The court notes that this was an error which will be addressed below.

2. The ALJ's decision is not supported by substantial evidence because she did not consider "the applicability of a borderline age approval." (Pl.'s Br. at 8-11).

3. The ALJ failed to properly apply the treating physician rule. (Pl.'s Br. at 12-14).

4. The ALJ's RFC finding is not supported by substantial evidence because she failed to include any limits on the movement of plaintiff's neck. (Pl.'s Br. at 14-15).

Defendant argues that the Commissioner's final decision is supported by substantial evidence, countering each of plaintiff's arguments. (Def.'s Br. at 5-24). For the following reasons, this court agrees with some of plaintiff's arguments and will order remand for further consideration by the agency.

## VI.   RFC/WEIGHING EVIDENCE

### A.   Legal Standards

#### 1.   RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill*, No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F.

Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Roat v. Barnhart,* 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v. Colvin,* 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL 374184, at *7).

### 2. Weight of the Evidence/Treating Physician

In making a determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996). Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings." The responsibility for

determining these issues belongs to the Commissioner.  *See* SSR 96-5p, 1996 WL 374183, at *2.  These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.*

In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d).  The ALJ must clearly state the legal rules that he applies and the weight that he accords the evidence considered.  *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ."  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  If an ALJ decides not to give the treating source's records controlling weight, then he must explicitly consider the four *Burgess* factors: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (quoting *Burgess v. Astrue*, 537 F. 3d 117, 120 (2d Cir. 2008)).  "[T]he ALJ must 'give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical]

opinion.' " *Id.* at 96 (citing *Halloran v. Barnhart*, 362 F.3d at 32).  Should an ALJ assign less than controlling weight to a treating physician's opinion and fail to consider the above-mentioned factors, this is a procedural error.  *Id.*  It is impossible to conclude that the error is harmless unless a "searching review of the record . . . assures us that the substance of the treating physician rule was not traversed." *Id.*

### B.    Application

Plaintiff argues that the ALJ failed to properly consider the medical opinions rendered by two of plaintiff's treating physicians: Dr. Jeff Sneider, M.D. and Dr. Thomas Masten, M.D. (Pl.'s Br. at 12-14).  Plaintiff does not exactly state the evidence upon which she relies for her argument.  She essentially argues that the ALJ did not discuss the factors required by *Estrella* and *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015), and that "a searching review [of the record] will not reveal that the rule was complied with." (Pl.'s Br. at 13).  In a separate section of her brief, plaintiff argues that the ALJ's RFC finding is not supported by substantial evidence and fails to take into account the difficulties that plaintiff has moving her neck, which are documented throughout the record. (Pl.'s Br. at 14-15).

Judge Peebles remanded this action for a proper consideration of the medical source statements ("MSS") authored by these two physicians. (T. 933-34).  Dr. Sneider, an internist, has been treating plaintiff for various conditions since at least 2002. (T. 477-78 - records from Dr. Sneider dated October of 2002).  Dr. Masten works for "Physical Medicine and Rehabilitation"–apparently affiliated with "Upstate Bone and Joint" (See T. 648)–but his specialty is listed as family practice. (T. 651).  Dr. Masten began seeing plaintiff in 2010 for her right groin and hip pain. (T. 635).

12

Dr. Sneider wrote two MSS reports, one dated November 20, 2012 and the second dated June 16, 2014. (T. 623-28, 645-47).  Dr. Masten wrote his MSS on November 27, 2012. (T. 630-35).  Judge Peebles remanded the action, in part, because ALJ Greener mis-cited the date of Dr. Sneider's first MSS, believing that it was written in 2011.  As a result, the ALJ compared the MSS as contemporaneous to, and found it inconsistent with, medical reports which had actually been written a year prior, and which stated that plaintiff had greater physical abilities that those assessed in the MSS. (T. 934).  Judge Peebles also found that the rejection of Dr. Masten's 2012 report, which was also inconsistent with the ALJ Greener's RFC finding, was not "well explained" and was not supported by substantial evidence. (T. 934).

After remand, ALJ Greisler found that plaintiff could perform "light" work, but added many restrictions, particularly with respect to plaintiff's ability to perform a particular function for an extended period of time.  The ALJ accepted the treating physicians' statements that plaintiff would need to change position, but not as frequently as the doctors indicated and would be able to sustain those functions for a longer period of time than both doctors indicated.[7] (T. 815).  ALJ Greisler found that plaintiff would

---

[7] In his November 20, 2012 MSS, in addition to finding that plaintiff could lift up to 10 pounds continuously and up to 20 pounds occasionally, Dr. Sneider found that plaintiff could sit for up to one hour, stand and walk for up to 30 minutes each, for a total of 2 hours sitting, 2 hours standing, and 2 hours walking in an 8-hour day. (T. 623-24).  He found that plaintiff could occasionally reach overhead, but never reach in "all other directions." (T. 625).  He found that plaintiff could frequently handle, finger, feel, push, and pull with both hands. (*Id.*)  He found that plaintiff could occasionally operate foot controls. (*Id.*)  He found that plaintiff could occasionally climb stairs, ramps, ladders, or scaffolds, balance, stoop, kneel, crouch, and crawl. (T. 626).  He found that plaintiff could occasionally work around unprotected heights, work around moving mechanical parts, operate a motor vehicle, and work around dust, fumes, extremes of temperature and vibrations. (T. 627).  She could continuously work around humidity and wetness. (*Id.*)  The plaintiff would be able to perform a variety of activities including shopping, walking a block on uneven surfaces, using public transportation, and sorting, handling, and using paper files. (T. 628).

need to change positions for five minutes after sitting, standing, or walking for one hour, but retained the ability to remain on task during those five minutes. (T. 815).

ALJ Greisler discussed both Dr. Sneider's and Dr. Masten's opinions at length, giving Dr. Sneider's opinions from 2012 and 2014 "partial weight" because, although the nature of the restrictions were supported by the record, they were "far more severe than supported by the record" and by her activities of daily living. (T. 822). The ALJ gave Dr. Masten's 2012 MSS "little weight." (T. 823). The also ALJ gave Dr. Masten's April 2011 treatment note statement that plaintiff was "100% disabled" from heavy

---

In his 2014 MSS, which was written on a different form with slightly different questions, Dr. Sneider found that plaintiff could only lift less than 10 pounds "occasionally." (T. 646). He found that plaintiff could only sit for 30 minutes and stand for 15 minutes "at one time," for a total of 2 hours sitting and 2 hours standing/walking in an 8-hour day. (T. 646). Dr. Sneider stated that plaintiff would have to be able to walk every 30 minutes for 5 minutes at a time. (*Id.*) Plaintiff would require a job that allowed shifting positions at will. Plaintiff would have to be allowed to take "unscheduled" breaks to stretch, "possibly" every 30 minutes. (*Id.*) Plaintiff could "rarely" look down or look up, but could "frequently" turn her head right or left and hold her head in a static position. (T. 647). Plaintiff could rarely twist, never stoop or crouch, but could occasionally climb ladders and stairs. (T. 647). Plaintiff could only use both hands to grasp, turn or twist 25% of an 8-hour day and could only use her fingers for fine manipulation 50% of an 8-hour day. (*Id.*) Plaintiff could only use her arms for reaching 20% of the day. She would have good and bad days, and likely be absent from work "about four days per month." (*Id.*) Dr. Sneider opined that plaintiff could not sustain full-time work for 8 hours per day, 5 days per week, and that these "symptoms and limitations" applied "since 2008." (*Id.*)

Dr. Masten's November 27, 2012, written one week after Dr. Sneider's 2012 report, stated that plaintiff could lift and/or carry up to 10 pounds only once or twice per day. (T. 630). Dr. Masten stated that plaintiff could sit for 2 hours, stand for 45 minutes, and walk for 45 minutes without interruption, but could only sustain sitting for 2 hours total, standing, and walking for 1 hour each total in an 8-hour day. (T. 631). Plaintiff would have to lie down "when needed" and change positions "at will." (*Id.*) She could occasionally reach, including overhead with her right hand, but Dr. Masten did not check any boxes for plaintiff's left side. (T. 632). He did not check any boxes relating to the use of her feet to operate foot controls, and stated that plaintiff should only drive one hour at a time. (*Id.*) The plaintiff could climb, balance, stoop, kneel, crouch, and crawl for less than one hour each. (T. 633). Dr. Masten indicated that plaintiff could never work at unprotected heights, but did not check any boxes for limitations as to any other "Environmental Limitations." (T. 634). Dr. Masten answered "yes" to questions regarding plaintiff's ability to perform a variety of daily activities, including shopping, traveling, walking a block on uneven ground, using public transportation, and preparing meals. (T. 635). Dr. Masten stated that plaintiff could "sort, handle, or use paper files," but only for one hour at a time "2˚ stand/sit." (*Id.*) Dr. Masten stated that plaintiff suffered from these symptoms/limitations since 2010, when Dr. Masten first evaluated her. (*Id.*)

work "no" weight because it was not accompanied by a "function-by-function" analysis. (T. 823) (citing T. 453).  The ALJ gave Dr. Masten's "extreme limitations" "no weight" because they were not supported by the evidence. (*Id.*)

In determining the weight to give the doctors' opinion evidence, ALJ Greisler discussed a great deal of medical evidence from before and after Dr. Sneider and Dr. Masten's MSSs. (T. 815-20).  Some of the evidence was not before Judge Peebles, but does relate to plaintiff's condition prior to her date last insured of December 31, 2016. While it is true that the factors in *Estrella* were not specifically enumerated by ALJ Greisler, the record does reveal that the ALJ considered the medical evidence and gave appropriate weight to the MSSs written by Dr. Masten and Dr. Sneider.

Dr. Sneider's 2012 MSS stated that plaintiff could lift up to 20 pounds occasionally and 10 pounds frequently, while Dr. Masten stated at approximately the same time, that plaintiff could lift only up to ten pounds once or twice per day.  Dr. Masten's contemporaneous progress note states that, on November 27, 2012, plaintiff went to Dr. Masten's office to have him fill out her "disability forms." (T. 665).  Dr. Masten stated that he had not seen plaintiff since October of 2011, and that "She notes" that she could only lift about 10 pounds once or twice per day, and that she could only carry approximately 10 pounds once or twice per day.[8] (T. 665).  Since Dr. Masten had not seen plaintiff for approximately one year when he completed the paperwork, stating that "she" told him how much, and how often she could lift, it is unclear whether Dr.

---

[8] Dr. Masten's treatment notes for November 27, 2012 also state that "[s]itting is good for up to 2 hours at a time, but really not much more than that in an 8-hour period.  She would rather lie down." (T. 665).  The notes also state that plaintiff was limited standing and reaching because of neck and arm pain, but Dr. Masten was not evaluating plaintiff's cervical impairment. (T. 665).

Masten's MSS was completely accurate, given Dr. Sneider's essentially contemporaneous opinion (issued one week prior on November 20, 2012) that plaintiff could lift up to 20 pounds occasionally and up to 10 pounds continuously. (T. 623).

Dr. Masten discussed the rest of the questions on the MSS in his contemporaneous progress notes.  As stated above, it appears from these treatment notes that plaintiff told Dr. Masten what her capabilities were for purposes of his 2012 MSS. (*Id.*)  Dr. Masten concluded his treatment note by stating that "this has been going on since around 2009.  I first met her in December 2010.  With that in mind we did fill out the paperwork for her." (*Id.*)  In his 2014 MSS, Dr. Sneider stated that plaintiff's significant limitations were present since 2008. (T. 647).  This is inconsistent with what Dr. Sneider stated in his 2012 MSS.  In addition in 2011, the court notes that plaintiff reported to Dr. Scuderi that she was "very active with running weightlifting, and martial arts."[9] (T. 450).  During Dr. Scuderi's examination, plaintiff exhibited symmetric and supple range of motion, with no real provocative symptoms and 5/5 strength in all major muscle groups.[10] (*Id.*)  Dr. Scuderi noted how well plaintiff had done after the hip injection, and recommended continued observation. (T. 451).

In a consultative examination, conducted in November of 2011 by Dr. Ammaji

---

[9] It does appear that plaintiff's condition became worse after 2011, when she stated that she was active in these sports.  In one of his progress notes, dated September 28, 2016, Dr. Sneider stated that plaintiff used to be an active runner, but now she cannot even walk any distance without pain. (T. 1309).  "She is definitely not running." (*Id.*)

[10] The court notes that Judge Peebles found that plaintiff's participation in these sporting activities occurred prior to Dr. Sneider's 2012 report, and that plaintiff's condition had worsened. However, I am citing this statement simply because Dr. Masten states that plaintiff's condition existed since 2009 and that he began seeing her in 2010, when she clearly had more physical abilities, not consistent with his 2012 MSS.

Manyam, M.D., plaintiff's gait was normal and she was able to walk on her heels and toes. (T. 518-22).  Plaintiff's cervical range of motion was painful, but her lumbar range of motion was full. (T. 521).  Straight leg raising was negative bilaterally, and she had full range of motion in her shoulders, forearms, and wrists on both sides. (*Id.*)  She had some crepitus in her right knee, but full range of motion in her hips, knees, and ankles. (*Id.*)  There were no sensory deficits, and strength was 5 out of 5 in both upper and lower extremities. (*Id.*)  Hand and finger dexterity were intact, and grip strength was 5/5 bilaterally. (*Id.*)  The only functional restrictions according to Dr. Manyam were "mild" limitations to prolonged walking and movement of the head to the left. (T. 522).  Thus, Dr. Masten's 2012 opinion that plaintiff's significant limitations existed since 2009 and Dr. Sneider's opinion that the symptoms and limitations existed since 2008 were contradicted by other evidence in the record which was written after 2008 and showed that plaintiff had greater functional capacity.[11]

During the November 27, 2012 appointment, Dr. Masten examined plaintiff for low back and groin pain, finding that flexion was 45 degrees, extension was 30 degrees with pain, but her heel/toe walking was "strong." (*Id.*)  While plaintiff exhibited restricted range of motion in her hip, the injections had resolved the pain to some extent. (*See* T. 650) (responsive to hip injection, she has seen Dr. Scuderi for this, MRI mild

---

[11] The court also notes that, although Dr. Masten stated that plaintiff was 100% disabled from "heavy duty," a statement that the ALJ rejected because it was conclusory, Dr. Masten also discussed plaintiff's potential for lighter work, but stated that National Grid did not have lighter work available for plaintiff, so that plaintiff was going to explore educational options for lighter work. (T. 453).  Thus, it appears that Dr. Masten may have believed that plaintiff was capable of lighter work.  In fact, his MSS stated that the diagnostic hip injections helped the pain "enough to live but not to work **hard**." (T. 632) (emphasis added).

labral tear, surgery not encouraged).  On May 16, 2013, Dr. Masten stated that plaintiff's low back pain was "under pretty good control," but that her hip was still a problem. (T. 651).  He discharged her at that time, noting that her neck and arm pain were a much bigger problem than her groin and hip, which were a bigger problem than her back. (T. 651).

It is true that plaintiff's condition may have gotten worse after the 2012 MSSs, and that in 2014, Dr. Sneider was also considering plaintiff's elbow and hand impairment from which she began suffering after 2012.  In April of 2014 plaintiff was referred to Orthopedic Surgeon Thomas Hahner for evaluation of her neck and cervical pain. (T. 721-24).  Plaintiff told Dr. Hahner that her pain had increased in severity to the point where she could no longer deal with the pain. (T. 721).  Plaintiff reported a pain level of 9/10,[12] aggravated by activity, involving numbness and weakness of her right arm and hand. (*Id.*)  Plaintiff stated that the pain was getting worse and that the pain/dysfunction was "moderate." (*Id.*)  However, upon physical examination, although the plaintiff was in "moderate distress," her gait was normal. (T. 723).  Dr. Hahner stated that plaintiff appeared in "no pain" during her spine inspection, and she demonstrated full flexion, extension, lateral bending, and side rotation of the cervical spine without limitation in all directions.  The lumbar spine was without significant limitation in all directions, and the range of motion in her thoracic spine was normal. (*Id.*)  There was no focal tenderness in the muscles of her cervical, thoracic, or lumbar

---

[12] However, on April 1, 2014, plaintiff reported that her "current" pain level was a 2/10, her "average" pain level was 4/10, and her "maximum" pain level was 10/10. (T. 689).  Although the ALJ stated that plaintiff never reported pain more than 5/10, that is not quite accurate.  The ALJ correctly noted that most of the time, plaintiff reported pain levels of between 2 and 3/10. (T. 816).

spines. (*Id.*)  Motor examination of both upper and lower extremities was 5/5, she had normal sensation, and her reflexes were 2+ bilaterally in her biceps, triceps, and brachioradialis. (*Id.*)  Straight leg raising was negative bilaterally, and Spurling's[13] test was negative on the right. (*Id.*)  Although Dr. Hahner stated that plaintiff was a candidate for surgery, it appeared that functionally, plaintiff's examination produced several normal findings. (T. 723-24).

On October 7, 2014, plaintiff saw Dr. Sneider and reported "new disc and right leg/foot pain. (T. 1334).  However, she had started physical therapy again and was feeling positive. (*Id.*)  Dr. Sneider reported that plaintiff had "full" range of motion in her neck. (T. 1334).  On June 17, 2015, Dr. Sneider stated that plaintiff's low back was doing better,[14] she had less back pain, was walking better, but she still could not run. (T. 1309).  He stated that plaintiff's neck and shoulders were "still a problem," and that her neck and arms were "still sore sometimes," but her headaches were no longer severe or frequent. (*Id.*)  On physical examination, she had limited range of motion in her neck, more to the right, with pain rotating right and left. (T. 1323).  She had a "glitch" as she moved her neck back and forth. (*Id.*)

The ALJ cited the report from a 2016 examination, during which both of plaintiff's elbows exhibited full active and passive range of motion with 5 out of 5 strength throughout. (T. 816) (citing Ex. 23F at 3 - T. 723).  On November 8, 2016,

---

[13] Spurling's Test is a test to diagnose cervical radiculopathy and involves passive cervical extension with rotation to the affected side and axial compression. https://www.ncbi.nlm.nih.gov/ books/NBK493152/.

[14] At that time, physical therapy was helping. (T. 1309).

19

plaintiff's elbows were examined by Orthopedic Specialist Nathan Everding, M.D. (T. 1357-60).  Dr. Everding also conducted a physical examination in which he found that plaintiff's head and neck as well as her thoracic spine were normal, atraumatic, non-tender, with a functional range of motion and normal tone. (T. 1359).  Plaintiff's elbows had full active and passive range of motion with 5 out of 5 strength throughout. (T. 1359).  Sensation was intact, but there was tenderness over the lateral epicondyle bilaterally.  There was pain "at the extent" of motion, mostly in the left elbow.  There was pain with resisted wrist extension, finger extension and forearm supination bilaterally. (*Id.*)  The ALJ correctly noted that, aside from pain in her left elbow and wrist, the physical examination revealed no signs of ulnar nerve pathology, bicipital pathology, instability, arthritis, or pain with resisted wrist flexion or forearm pronation, bilaterally. (T. 817) (citing T. 1359).

On September 7, 2016, plaintiff underwent a consultative examination by Kalyani Ganesh, M.D. (T. 1287-90).  Plaintiff's cervical spine showed full flexion, extension, and lateral flexion as well as full rotary movement bilaterally. (T. 1289).  There was limitation in the range of motion of plaintiff's lumbar spine, and she could not perform rotation.  She had full range of motion in her shoulders, forearms, and wrists bilaterally. (*Id.*)  Plaintiff had full range of motion in her hips, knees, and ankles. (*Id.*)  Dr. Ganesh found 5 out of 5 strength in plaintiff's upper extremities, and her hand strength and finger dexterity were intact.[15] (*Id.*)

---

[15] The ALJ also discussed the opinion of non-examining medical expert Dr. S. Chandrasekhar from August of 2018. (T. 820) (*See* T. 1565-73).  The ALJ sent Dr. Chandrasekar interrogatory questions together with most of the medical evidence in the file. (T. 1565) (citing Ex. 1E-31E and 1F-47F).  Dr. Chandrasekhar assessed very few limitations, and the ALJ gave Dr. Chandrasekhar's

The court notes that in 2018, although long after the plaintiff's date last insured, she went to Syracuse Orthopedic Specialist ("SOS") and saw a physicians' assistant. (T. 1340). She had mild to moderate soreness in her wrist. She had been seen a few weeks prior for an injection in her wrist, which "resolved" her symptoms, but returned with pain after "she did a lot of excessive lifting recently." (*Id.*) In October of 2015, she injured her knee and reported to the physician that she had been using the treadmill and doing some weight training. (T. 1297). She injured her knee while she was trying to run at Green Lakes. (*Id.*) Notwithstanding her knee pain, due to her attempt at running, the doctor found that plaintiff had full active range of motion and full motor strength in her knees. The doctor's opinion was that she exacerbated her chondromalacia. (*Id.*) He told her to "stick to the treadmill" and to low impact exercises. (*Id.*)

There is no question that plaintiff has numerous limitations, which were accounted for in the ALJ's RFC. Essentially, the ALJ accepted many of the limitations set forth by Dr. Sneider and Dr. Masten, but did not find that the extent of the limitations was supported by substantial evidence.[16] After the court's remand, the ALJ obtained additional evidence and medical reports which provided support for the weight that she gave to the MSSs of both treating providers. Conflicting evidence is for the ALJ to evaluate and weigh. *See Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (where there is conflicting evidence, the court defers to the Commissioner's

---

opinion "partial weight" because "the totality of the record supported greater restrictions." (T. 820).

[16] The ALJ specifically mentioned Dr. Sneider's 2012 MSS opinion that plaintiff would be absent from work for four days per month, but found that, together with the other more extreme limitations, this was not supported by the medical evidence or by plaintiff's activities of daily living. (T. 822).

resolution).  Thus, even though the ALJ did not articulate every factor in *Estrella*, a searching view of the record shows that the treating physician rule was not transgressed.

With respect to the plaintiff's argument that the ALJ should have considered the limits on the movement of plaintiff's neck or head, although there is evidence in the record that plaintiff has limits on such motion, there are also reports, as cited above, which state that plaintiff had full range of motion in her neck.  The ALJ mentioned a report from 2010 which showed "slight limits" on the range of motion in her neck (T. 816) and considered reports in which plaintiff alleged that the pain from her neck radiated into her shoulders arms and elbows. (T. 816) (*see* T. 1287).[17]  The ALJ further discussed a November, 2011 consultative examination which stated that plaintiff's cervical range of motion was painful, but followed that statement with a citation to a 2016 report in which stated that plaintiff's cervical spine had "full rotary movement bilaterally." (T. 817) (citing T. 521 - left side cervical movements painful and T. 1289 - cervical spine -full rotary movement bilaterally).

The ALJ also considered plaintiff's activities throughout the period in question. (T. 818).  In addition to the activities cited above, these other activities involved cooking, shopping, going out to eat, attending college part-time, walking her dog, using the treadmill, and weightlifting. (*Id.*)  The ALJ noted that "all the aforementioned activities required the claimant to perform various exertional, manipulative, and postural

---

[17] The ALJ mis-cites the exhibit in her decision. (T. 816).  She cites to Ex. 30F at p.1, but the information to which she cites appears in Ex. 31F at p.1.  I have cited to the correct page of the transcript.

actions and did not support the greater limitations that the claimant alleges."[18] (*Id.*)
Again, the ALJ had conflicting evidence from which she chose to support her RFC
evaluation, and the ALJ did not err in failing to include a limitation on the motion of
plaintiff's neck in her RFC.[19]  Thus, the ALJ's RFC finding was supported by
substantial evidence in the record.  However, as discussed below, the ALJ's step five
determination is not properly supported, and the case must be remanded to the
Commissioner.

## VII.   **Borderline Age Category**

### A.     **Legal Standards**

In the ordinary case, the ALJ carries out the fifth step of the sequential disability
analysis by applying the applicable Medical-Vocational Guidelines ("the Grids").  *Id.*
The Grids divide work into sedentary, light, medium, heavy, and very heavy categories,
based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull.
20 C.F.R. Pt. 404, Subpt. P, App. 2; *Zorilla v. Chater*, 915 F. Supp. 662, 667 n.2
(S.D.N.Y. 1996).  *See also* 20 C.F.R. §§ 404.1567 & 416.967.  Each exertional category
of work has its own Grid, which then takes into account the plaintiff's age, education,
and previous work experience.  *Id.*  Based on these factors, the Grids help the ALJ
determine whether plaintiff can engage in any other substantial work that exists in the
national economy.  *Id.*

---

[18] The court notes that plaintiff has depression, but she does not argue that the ALJ improperly
considered this impairment in the RFC, and therefore, this court is not addressing any mental
limitations.

[19] The ALJ recognized that plaintiff would be limited to "occasional" reaching overhead, and
"frequent" reaching in all other directions. (T. 815).  Thus, the ALJ did take some reaching limitations
into account when establishing plaintiff's RFC.

The Grids contain three age categories: "younger person" (under age 50); "person closely approaching advanced age" (age 50–54); and "person of advanced age" (age 55 or older). 20 C.F.R. § 404.1563(c)-(e).  The Regulations provide that these age categories should not be applied "'mechanically' in so-called 'borderline age situation[s],' which exist when (1) the claimant is 'within a few days to a few months of reaching an older age category,' and (2) 'using the older age category would result in a determination or decision that [the claimant] [is] disabled[.]'" *Goncalves v. Berryhill*, No. 3:17-CV-01830 (JCH), 2018 WL 6061570, at \*3 (D. Conn. Nov. 20, 2018) (quoting 20 C.F.R. § 404.1563(b)).  In these situations, the ALJ must determine whether it is more appropriate to use the older age category, rather than the claimant's chronological age, to determine the claimant's disability status. *Id.* (citing 20 C.F.R. § 404.1563(b); HALLEX I-2-2-42(B)).

"When deciding which age category to use, SSA guidance directs ALJs to take a 'sliding scale' approach that considers 'the overall impact of all the factors on the claimant's ability to adjust to doing other work (e.g., residual functional capacity combined with age, education and work experience. . . .).'" *Id.* (quoting Social Security's Hearings, Appeal and Litigation Law Manual ("HALLEX") I-2-2-42(C); 20 C.F.R. § 404.1563(b) ("[W]e will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.")).  The regulations intentionally do not specify a numerical threshold for when a plaintiff's age becomes "borderline." *Id.* at \*4 (citing HALLEX I-2-2-42(B)(1) ("SSA does not have a precise programmatic definition for the phrase 'within a few days to a few months.' ")).  The Social Security Administration has noted that the word "few" should be given its

"ordinary meaning," and that "the Commissioner generally 'considers a few days to a few months to mean a period not to exceed six months.'" *Goncalves v. Berryhill*, 2018 WL 6061570, at *4 (quoting HALLEX I-2-2-42(B)(1); Social Security's Program Operations Manual System ("POMS") DI 25015.006(B)).

In *Goncalves*, the court stated that "most but not all courts in this Circuit have found that claimants who are within six months of reaching an older age category qualify as a borderline age situation." *Id.* (citing inter alia *Hollinsworth v. Colvin*, No. 15-CV-543 (FPG), 2016 WL 5844298, at *5 (W.D.N.Y. Oct. 6, 2016) (collecting cases in which courts have held that a period of up to six months was borderline); *Torres v. Comm'r of Soc. Sec.*, No. 14-CV-6438P, 2015 WL 5444888, at *10 (W.D.N.Y. Sept. 15, 2015) (same); *Metaxotos v. Barnhart*, No. 04 Civ. 3006 (RWS), 2005 WL 2899851, at *7–8 (S.D.N.Y. Nov. 3, 2005) (finding that six months and fourteen days was borderline)).  However, the court in *Goncalves* also cited *Waldvogel v. Comm'r of Soc. Sec.*, No. 6:16-CV-868, 2017 WL 3995590, at *11 (N.D.N.Y. Sept. 11, 2017) and *Smolinski v. Astrue*, No. 07-CV-386, 2008 WL 4287819, at *4 (W.D.N.Y. Sept. 17, 2008) which both concluded that *three months* was the outer limit of a borderline age situation.  Most recently, the District Court in Connecticut remanded a case due to the ALJ's failure to consider plaintiff's borderline age when he was approximately five months from the older age category. *See Spease v. Saul*, No. 3:19-cv-1199 (JAM), 2020 WL 3566902, at *7-10 (D. Conn. July 1, 2020).

## B.    Application

This case has been going on for quite some time.  Plaintiff's birth date is June 14, 1962, making her 48 years old, a "younger individual," on her *onset date* of December

25

6, 2010.  By her *date last insured* of December 31, 2016, she was 54 years old, which is "closely approaching advanced age,"[20] but was approximately 6 months away from her 55th birthday, which would take her into the "advanced age" grid category.  In considering the grids, the ALJ used an RFC of "light work."  The ALJ then considered Medical-Vocational Rules 202.20 and 202.13, finding that the Grids would dictate a finding of "not disabled" if plaintiff had the RFC to perform a "full range" of light work.

Rule 202.20 for a light work RFC assumes a younger individual with a high school "or more" education, and unskilled or "no" previous work experience. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 202.20.  Rule 202.13 assumes an individual closely approaching advanced age, with a high school "or more" education, and unskilled or no previous work experience. *Id.* § 202.13.  Both of these rules dictate a "not disabled" finding.  However, if one considers that the same individual is of "advanced age," there are two potentially relevant rules, the first assumes an individual with a high school or "more" education that does not provide for entry into skilled work, and unskilled or no previous work experience.[21] *Id.* § 202.04.  This rule dictates a finding of "disabled." *Id.* The second rule assumes an individual with a high school or "more" education that does

---

[20] The ALJ mis-cited plaintiff's age category. (T. 824).  The ALJ stated that plaintiff was "54 years old, which was defined as a younger individual 18-49, on the date last insured.  The claimant subsequently changed age category to closely approaching advanced age . . . ."  Clearly, this was a typographical error.  Plaintiff was 54 years old on the date last insured, but was not a "younger individual" at that time.  This particular error does not affect the court's decision.

[21] There is a footnote to this statement in Rules 202.04 and 202.05 referring to § 202.00(c), which states that "even a high school education or more which was completed in the remote past will have little positive impact on effecting a vocational adjustment unless relevant work experience reflects use of such education."

provide for entry into skilled work, and unskilled or no previous work experience. *Id.* §

202.05.  This rule dictates a finding of "not disabled." *Id.*

The ALJ never specifically considered whether plaintiff was close enough to the

next age category on her date last insured to use the "advanced age" grid.  Because there

was no consideration of whether to use the advanced age category, there was also no

consideration of whether Rule 202.04 or 202.05 would have applied to plaintiff.  If Rule

202.04 applied, the grid would have dictated a finding of disability even without the

VE's evidence.

The plaintiff in *Goncalves* was five months from the next age category, and the

court concluded that the plaintiff "fell within the outer limits of a borderline age

situation, and the ALJ erred in mechanically applying the plaintiff's chronological age

without even discussing whether it would be appropriate to move him into the older age

category. 2018 WL 6061570, at *4.  The court in *Goncalves*, remanded the case for

further consideration of whether to use the older age category, notwithstanding that the

ALJ also used a VE to make the disability determination.

This court agrees with *Hollinsworth, supra* which cites several district court cases

from within the Second Circuit holding, consistent with the agency guidance, that "up to

six months from the next age category may be "borderline."  In this case, the plaintiff

was 5 months and 14 days from her 55th birthday and the older age category.  Thus, the

ALJ erred in failing to consider whether plaintiff's case should be treated as borderline.

The court must also consider whether the ALJ's error was harmless.  As stated

above, other courts have remanded cases when the ALJ erred in considering the

plaintiff's borderline age, notwithstanding the subsequent use of a VE.  In this case, the

court notes that even though the ALJ did not properly consider the borderline issue when determining which Grid category to use, when she wrote the interrogatory to VE Festa, her first hypothetical assumed an individual of "advanced age." (T. 1226).  The VE thus, made his determination based upon an individual of "advanced age."  While this could make the ALJ's error harmless,[22] an issue which I do not specifically decide, the following section will show that the ALJ's error was not cured by the VE's interrogatory response because the VE did not provide sufficient numbers of jobs to be "significant," regardless of the plaintiff's age category.

## VIII.  VE/NUMBER OF JOBS

### A.    Legal Standards

If a claimant is unable to perform a full range of a particular exertional category of work, or the issue is whether a claimant's work skills are transferable to other jobs, then the ALJ may utilize the services of a vocational expert.  20 C.F.R. §§ 404.1566, 416.966.  A vocational expert may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations.  *See Rautio v. Bowen*, 862 F.2d 176, 180 (8th Cir. 1988); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

If the ALJ utilizes a VE at the hearing, generally, the VE is questioned using a

---

[22] If the ALJ used the older age category, consultation with the VE would not have been necessary since the Grid would have found the plaintiff disabled.  In addition, the court notes that, in a different factual situation, the Fifth Circuit rejected a finding of harmless error when the ALJ did not consider the possibility of a borderline age case. *See Schofield v. Saul*, 950 F.3d 315, 320-21 (5th Cir. 2020).  The court in *Goncalves* rejected a finding of harmless error, notwithstanding the Appeals Council mentioning the plaintiff's borderline age in denying review, again a different situation than in the instant case. 2018 WL 6061570, at *5-6; *Waldvogel v. Comm'r of Soc. Sec.*, 2017 WL 3995590, at *12-13 (same).

hypothetical that incorporates plaintiff's limitations.  Although the ALJ is initially responsible for determining the claimant's capabilities based on all the evidence, *see Dumas v. Schweiker*, 712 F.2d 1545, 1554 n.4 (2d Cir. 1983), a hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational expert testimony.  *See De Leon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984); *Lugo v. Chater*, 932 F. Supp. 497, 503-04 (S.D.N.Y. 1996).  The Second Circuit has stated that there must be "substantial record evidence to support the assumption upon which the vocational expert based [her] opinion." *Dumas*, 712 F.2d at 1554. *See also Peatman v. Astrue*, No. 5:10-CV-307, 2012 WL 1758880, at *7 n.5 (D. Vt. May 16, 2012) (the hypothetical question posed to the VE must accurately portray the plaintiff's physical and mental impairments) (citations omitted); *Green v. Astrue*, No. 08 Civ. 8435, 2012 WL 1414294, at *18 (S.D.N.Y. April 24, 2012) (citing *Dumas,* 712 F.2d at 1553-54).

## B.    Application

In this case, the ALJ consulted VE Festa by interrogatory. (T. 1224-37).  The ALJ asked VE Festa four hypothetical questions.  The first hypothetical question assumed an individual of "advanced age" (55-59), with a high school education and plaintiff's prior medium to heavy work experience. (T. 1226).  The hypothetical further assumed that the individual could perform "light work," but with the additional restrictions outlined above.  The VE stated that the hypothetical individual could not perform plaintiff's past relevant work, but could perform the following jobs in the national economy: (1) Shipping and Receiving Weigher - "National Statistics" - 1,810; (2) Usher - "National Statistics" - 5,133, and (3) Counter Clerk - "National Statistics" - 1612.  These jobs total

8,555 in the national economy.  Plaintiff argues that 8,555 jobs are insufficient for purposes of finding that jobs exist in "significant" numbers in the national economy. This court agrees.

Courts have held that a "significant number" of jobs is "fairly minimal." *Rosa v. Colvin*, No. 3:12-CV-170, 2013 WL 1292145, at *9 (N.D.N.Y. March 27, 2013) (citing *Fox v. Comm'r of Soc. Sec.*, No. 6:02-CV-1160, 2009 WL 367628, at *20 (N.D.N.Y. Feb. 13, 2009)).  In *Koutrakos v. Colvin*, Magistrate Judge Joan Margolis discussed the "significant numbers issue" and reviewed the some of the case law discussing whether "significant numbers" existed. *Koutrakos v. Colvin*, No. 3:13-CV-1290, 2015 WL 1190100, at *20-22 (D. Conn. Mar. 16, 2015).  Magistrate Judge Margolis stated that "[n]either the Social Security Act, nor the Commissioner's Regulations or Rulings provide a definition for a 'significant' number of jobs." *Id.* at *21.  The court is generally guided by numbers that have been found "significant" in other cases. *Id.* (citing *Schadenfroh v. Colvin*, No. 09-CV-223, 2014 WL 1260123 (S.D. Ind. Mar. 27, 2014)).  Significant numbers include 408 jobs in the *regional* economy and 98,008 jobs in the national economy; and 180 jobs in the regional economy and 40,027 jobs nationally. *Barbato v. Astrue*, No. 09-CV-6530, at *7 (W.D.N.Y. July 7, 2010) (citing *Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (1400 jobs was significant)[23] (citing cases); *Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987) (174 jobs in the local economy, 1600 in the state, and 80,000 in the national economy were significant);

---

[23] Although the court in *Lee* did not specify that it was referring to the "local" economy, the case that it cited for the proposition that 1350 jobs was "significant" was a case in which the number was referring to numbers in the local economy. 988 F.2d at 794 (citing *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988)).

30

*Dumas v. Schweiker*, 712 F.2d 1545, 1549, 1553-54 (2d Cir. 1983) (150 jobs in the local economy and 112,000 in the national economy)).  In *Fox*, *supra*, the court found that 200 surveillance system monitor jobs in the Central New York Region were significant. *See also Roe v. Colvin*, No. 1:13-CV-1065, 2015 WL 729684, at *7 (N.D.N.Y. Feb. 19, 2015) (630 jobs locally and 44,000 nationally was significant); *McCusker*, 2014 WL 6610025, at *3 (100 jobs in the Capital Region; 2,250 in New York State, and 74,470 nationally was significant); *Gray v. Colvin*, No. 12-CV-6485, 2014 WL 4146880, at *6 (W.D.N.Y. Aug. 19, 2014) (60 jobs regionally, but over 16,000 nationally was a significant number).

In *Koutrakos v. Colvin*, the court questioned whether 85 jobs in the state of Connecticut were a "sufficient number" of surveillance system monitor jobs.  However, the VE in *Koutrakos* also testified that there were 1,296 information clerk jobs in Connecticut and 152,000 nationally, which was a significant number. 2015 WL 1190100, at *22 (citing inter alia *Durante v. Colvin*, No. 13-CV-1298, 2014 WL 4843684, at *5 (D. Conn. Sept. 29, 2014) (finding that 660 positions in the state of Connecticut is a significant number); *Dugan v. Soc. Sec. Admin. Comm'r*, 501 F. App'x 24, 25 (2d Cir. 2012) (noting VE's testimony that there were two jobs with a total of 600 positions in Vermont and 344,000 nationwide)).  Because of the additional job with a more extensive number of positions in the state of Connecticut, the court in *Koutrakos* affirmed the Commissioner's determination and found that the VE had cited significant numbers of jobs that the plaintiff could perform.

In *Vining v. Astrue*, 720 F. Supp. 2d 126, 136 (D. Me. 2010), the court found that "assuming" that 30 jobs in the state of Maine is ***not*** a "significant" number in the region

where plaintiff lives," 11,000 nationwide was a "significant number in several other regions of the country." However in *Leonard v. Heckler*, 582 F. Supp. 389, 391 (M.D. Pa 1983), the court held that 4,000 to 5,000 jobs nationwide was ***not*** a significant number, given that it was "a minuscule fraction of the number of jobs existing in the national economy." The court in *Vining* estimated that "numbers of jobs in the ballpark of 10,000 to 11,000 nationwide have been held 'significant.'" 720 F. Supp. 2d at 136 (citing inter alia *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) (200 jobs in Iowa and 10,000 nationally was significant); *McGee v. Astrue*, No. 08-831, 2009 WL 2841113, at *6 n.14 (W.D. La. Aug. 28, 2009) (150 jobs in Louisiana and 18,760 nationally was found significant)). In *Beltran v. Astrue*, 700 F.3d 386, 389-90 (9th Cir. 2012), the court found that 135 regional jobs and 1,680 national jobs was not significant. The court specifically stated that "[a]lthough 1,680 jobs might seem a 'significant number' standing alone, distributing these jobs between several regions across the nation shows that it is not 'significant' after all."

In *Terri G. v. Commissioner of Soc. Sec.*, No. 3:18-CV-66, 2019 WL 1318074, at *11 (N.D.N.Y. Mar. 22, 2019), the VE found 9,493 jobs in the national economy that the plaintiff could perform. However, Magistrate Judge Hummel stated that he was not "convinced" that the "Commissioner has demonstrated that there exists a significant number of jobs available to Plaintiff in the national economy." Magistrate Judge Hummel remanded on that basis. *Id.* In *Peach v. Berryhill*, No. 1:17-CV-201, 2018 WL 414063, at *3-5 (W.D.N.Y. Aug. 30, 2018), the court found that 8,991 jobs was not a significant number in the national economy. In doing so, the court in *Peach* distinguished *Taskila v. Comm'r of Soc. Sec.* 819 F.3d 902, 905 (6th Cir. 2016) in which

the court found that 6,000 jobs was "significant." *Peach*, 2018 WL 414063, at *4.

The Commissioner in this case also cites *Taskila* for the proposition that 6,000 jobs nationwide is significant. (Def.'s Br. at 24).  However, ***every case*** cited by the court in *Taskila* in support of its finding was referring to "regional" numbers, not "national" numbers. *See Taskila, supra* (citing *Michelson-Worm v. Comm'r of Soc. Sec.*, 285 F. App'x 482, 486-87 (9th Cir. 2008) (found 2,000 jobs in Oregon sufficient and stated that 1,000 to 1,500 in the regional economy were sufficient); *Nejat v. Comm'r of Soc. Sec.*, 369 F. App'x 574, 578-79 (6th Cir. 2009) (cites *Michelson* for the proposition that 2,000 jobs are sufficient, but never distinguishes whether the court is referring to regional or national job numbers); *Liskowitz v. Astrue*, 559 F.3d 73, 743 (7th Cir. 2009) (finding 4,000 in the Milwaukee area was sufficient and stating that 1,000 would be sufficient); *Jenkins v. Bauer*, 861 F.2d 1083, 1087 (8th Cir. 1988) (finding that 500 in the region in which plaintiff lived were sufficient); *Barker v. Sec. of HHS*, 882 F.2d 1474, 1479 (9th Cir. 1989) (finding that 1,266 jobs in the regional economy were sufficient)).  Thus, *Taskila* and cases relying on *Taskila* to find that 6,000 jobs in the "national" economy are sufficient do not support the Commissioner's argument in this case.

Instead, this court finds *Peach v. Berryhill* persuasive in its finding that 8,991 jobs in the ***national*** economy are not sufficient jobs to sustain the Commissioner's burden at step five and will remand on that basis, particularly when the ALJ also erred in failing to consider plaintiff's borderline age when determining which Grid section to use.[24]  It is unclear from the VE's interrogatory whether the three jobs listed were

---

[24] As stated above, if the older age category were appropriate in plaintiff's case, then the Grid could have dictated a finding of "disabled" without the VE's evidence.

"representative" jobs and whether there are other jobs that the plaintiff can perform given the limitations in her RFC, but the Commissioner may revisit that issue on remand.

WHEREFORE, based on the findings above, it is

ORDERED, that the Commissioner's decision is **REVERSED**, and this case is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. 405(g) for further proceedings consistent with this opinion.

Dated: July 13, 2020

Andrew T. Baxter
U.S. Magistrate Judge